UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOHANNA BARRETT,

               Plaintiff,

     -against-

COMMISSIONER OF SOCIAL SECURITY,

               Defendant,
------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**13-CV-0876 (NGG)**

Plaintiff Johanna Barrett ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Social Security Administration's (the "SSA") decision that Plaintiff is not disabled and therefore does not qualify for Social Security Disability and Supplemental Security Income benefits. Plaintiff argues that the SSA made two errors in denying her application for benefits: (1) that the administrative law judge ("ALJ") did not apply the correct legal standards; and (2) that the ALJ's decision is not supported by substantial evidence. Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security (the "Commissioner"), has filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), seeking affirmance of the Commissioner's decision. Plaintiff has filed a cross-motion for judgment on the pleadings, seeking reversal or remand. (See Def.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Def. Mem") (Dkt. 16); Pl.'s Mem. of Law in Supp. of Cross-Mot. for J. on the Pleadings ("Pl. Mem.") (Dkt. 18).) For the reasons set forth below, the Commissioner's motion is DENIED, Plaintiff's motion is GRANTED, and this case is REMANDED to the SSA for further proceedings.

## I. BACKGROUND

Plaintiff was born on June 8, 1975. (See Administrative R. ("R.") (Dkt. 6) at 124.) She is a high school graduate and completed one year of college. (Id. at 169, 217.) She was last employed by the Board of Education, for which she performed clerical work from 1993 through 2003. (Id. at 217.) This work involved gathering data, and was primarily sedentary (for approximately five hours out of each seven-hour workday), with some light physical activity consisting of lifting files and books weighing less than ten pounds. (Id. at 55-58.) Plaintiff voluntarily ceased working full-time in 2003 in order to take care of her child. (Id. at 57.) Since 2003, Plaintiff has worked only part-time; specifically, from 2003 through May 2010, she worked two-and-one-half hours per day, two days per week, as a laboratory technician. (Id. at 166.) In May 2010, Plaintiff quit her part-time job as a laboratory technician because of recurrent flashbacks, crying, and a desire not to leave her home. (See id. at 41-42.)

For at least two years leading up to October 2, 2008, Plaintiff was the victim of domestic violence committed by her husband, consisting of physical, emotional, and economic abuse. (See id. at 50-52, 262, 425, 449, 532; see also id. at 266 (suggesting six years of such abuse).) Following an October 2, 2008, incident of physical abuse, Plaintiff obtained an order of protection, and her husband left the home; on November 3, 2008, Plaintiff was referred by the Safe Horizon Brooklyn Family Justice Center to Safe Horizon Counseling Center ("SHCC"). (Id. at 449, 532.) Plaintiff described "experiencing symptoms of trauma" and expressed "concern[]" about her children "acting out" and "becoming more violent" with her husband now out of the home. (Id. at 449.) Between November 2008 and October 2010 (the date of Plaintiff's hearing before the ALJ), Plaintiff was seen by several different therapists and medical professionals at SHCC; their reports and treatment notes are discussed below.

2

## A. Medical and Therapeutic Evidence

### 1. Primary Care Physician

Dr. Parag Mehta is Plaintiff's primary care physician. (See, e.g., id. at 167-68, 196, 214, 263.) The record is devoid of any medical reports or notes of Dr. Mehta; however, Dr. Mehta is listed numerous times in the produced records as Plaintiff's primary care physician. Plaintiff reported that Dr. Mehta had prescribed her Cymbalta and Lexapro, medications used to treat major depressive disorder and general anxiety disorder,[1] prior to Plaintiff receiving treatment at SHCC. (See id. at 214, 262-63, 483.) According to Plaintiff, Dr. Mehta urged her to seek therapy. (Id. at 262, 461.)

### 2. Psychiatric and Psychological Evidence

#### a. Dr. Nina Jacobs, M.D.

Plaintiff received treatment from Dr. Nina Jacobs, M.D., an SHCC psychiatrist, from December 2008 through June 2009. (See id. at 312, 381, 483, 534.) In her original treatment notes, dated December 8, 2008, Dr. Jacobs wrote that Plaintiff reported feeling "increasingly depressed" and that she had recently "experienced transient suicidal ideation"; additionally, Plaintiff had made "several superficial cuts to her forearm." (Id. at 483-84.) Plaintiff stated, however, that she was not suicidal at the time. (Id. at 483.) Dr. Jacobs provided Plaintiff with psychoeducation regarding depression, anxiety, and Post Traumatic Stress Disorder ("PTSD"). (Id.) Dr. Jacobs prescribed Seroquel to treat Plaintiff's insomnia, anxiety, and mood lability.[2] (Id.) The treatment notes reference Plaintiff's use of Cymbalta and Lexapro, which Plaintiff felt

---

[1] See http://www.drugs.com/cymbalta.html (last visited July 14, 2015); http://www.drugs.com/lexapro.html (last visited July 14, 2015).

[2] Mood lability refers to frequent fluctuation of mood or emotions. See psychcentral.com/encyclopedia/2008/labile-mood/ (last visited July 14, 2015); see also medical-dictionary.thefreedictionary.com/emotional+lability (last visited July 14, 2015) (definition of "emotional lability").

were no longer helpful; Dr. Jacobs noted that she would consider discontinuing the Lexapro. (Id.)

Additionally, Dr. Jacobs co-signed three SHCC treatment plan reviews dated December 19, 2008; December 29, 2008; and March 27, 2009—each of which are also co-signed by Plaintiff's therapist, Jessica Paddock,[3] Social Work Intern ("S.W.I."); and by an SHCC supervisor, C. Danette Wilson Gonzalez, Licensed Clinical Social Worker with Psychotherapy "R" Privilege ("L.C.S.W.-R."). (See id. at 532-41.) These reviews each note that Plaintiff had a number of symptoms of PTSD, including "re-experiencing, persistent avoidance and increased arousal," that the symptoms were "overwhelming" to Plaintiff and "impact[ed] her ability to function," and that Plaintiff had a "history of suicidal ideation and intent as well as self-mutilation." (Id.) The reviews assign Plaintiff an Axis I diagnosis of PTSD and major depressive disorder, recurrent. (Id. at 532, 536, 539.) They also assign Plaintiff a current GAF of 50,[4] and a GAF of 55 over the past year. (Id.)

In connection with the March 27, 2009, treatment plan review, these SHCC professionals noted that Plaintiff had had "some success in learning about the impact of trauma on her current functioning," and was "learning affect regulation techniques and practicing them outside of session," which enabled Plaintiff to fall asleep faster, and helped her to avoid self-medicating with alcohol. (Id. at 533-34.) This review also noted that Plaintiff was "open and honest in sharing her ongoing trauma reactions and has demonstrated willingness to examine and modify her trauma-related cognitive distortions." (Id. at 534.)

---

[3] It appears that Ms. Paddock used the last name "Mayberry" until January 2009. (See id. at 335-40.)

[4] A score of 50 on the Global Assessment Functioning ("GAF") scale reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) (DSM-IV) (emphases omitted).

Dr. Jacobs also co-signed an April 22, 2009, SHCC report, along with Ms. Paddock and Ms. Gonzalez. (See id. at 381-82.) This "closing summary" report documented Ms. Paddock's treatment of Plaintiff, as Ms. Paddock prepared to leave SHCC at the close of her internship, and Plaintiff would be transferred to another therapist. (Id. at 381; see also id. at 321.) Upon closing, Plaintiff is assigned an Axis I diagnosis of PTSD and major depressive disorder, recurrent; she is determined to be in stable condition. (Id. at 381-82.) The summary report notes that Plaintiff had experienced "some success" with respect to treatment goals, including the goal that Plaintiff's "trauma reactions . . . be less frequent, intense, and disruptive"; it also discusses "barriers to treatment," such as Plaintiff's "ambivalence about what she wanted in treatment compared to what she wanted in her current relationship," and Plaintiff's "trauma avoidance, which was manifested by [her] occasional habit of avoiding the topic of domestic violence while in session, as well as occasional missed therapy sessions." (Id. at 381.)

### b.    Dr. Julie Low, M.D.

Dr. Julie Low, M.D., another SHCC psychiatrist, treated Plaintiff from June 2009 through March 2010. (See id. at 482, 530.) In treatment notes dated March 22, 2010, Dr. Low diagnosed Plaintiff with Bipolar II. (Id. at 481.) She indicated that Plaintiff "continue[d] to have fewer mood swings, less irritability and anger," and that Plaintiff's headaches had "resolved." (Id.) Dr. Low noted Plaintiff's use of the following medications: Abilify and Seroquel, for mood lability; Trazodone, for insomnia; and Cogentin, for akathisia.[5] (Id.) Plaintiff's sleep had improved since she had begun taking Abilify. (Id.)

---

[5] Akathisia is described as a "syndrome characterized by an inability to remain seated, with motor restlessness and a feeling of muscular quivering; [which] may appear as a side effect of antipsychotic and neuroleptic medication." See www.medilexicon.com/medicaldictionary.php?s=akathisia (last visited July 14, 2015); http://medical-dictionary.thefreedictionary.com/akathisia (last visited July 14, 2015).

Dr. Low also co-signed four SHCC treatment plan reviews dated June 29, 2009; September 21, 2009; December 21, 2009; and March 22, 2010—each of which are also co-signed by Plaintiff's therapist, Sherri Robinson, L.C.S.W.-R.; and by an SHCC supervisor, Dr. Ruth Forero, L.C.S.W. (See id. at 516-31.) These reviews continue to assign Plaintiff an Axis I diagnosis of PTSD and major depressive disorder, recurrent; and a current GAF of 50—notwithstanding Dr. Low's March 22, 2010, treatment notes diagnosing Plaintiff with Bipolar II. (Compare id. at 516, 520, 524, 528, with id. at 481.)

In the treatment plan review dated June 29, 2009, these SHCC professionals identified a "new problem," namely, that Plaintiff was "using alcohol to help manage trauma symptoms in addition to taking her psychotropic medication," and they noted that they would introduce to Plaintiff's therapy "topics from [the] Safety Seeking [treatment model for PTSD] to learn ways to manage PTSD symptoms and substance use." (Id. at 530.) They also noted that Plaintiff's trauma symptoms were being "triggered by her children's behavior." (Id. at 529.)

Plaintiff's use of alcohol to manage trauma symptoms was also noted in the treatment plan review dated September 21, 2009; this review reported that Plaintiff "remaine[d] compliant with [her] medication[s]." (Id. at 526.) In the treatment plan review dated December 21, 2009, the SHCC professionals again noted that Plaintiff was compliant with medication, and that she had "reached out to therapist when distressed but has not expressed suicide or homicidal ideation/plan." (Id. at 522.) This review also noted that Plaintiff "uses the tools learned [in therapy] to help manage trauma symptoms such as intrusive thoughts without the use of alcohol." (Id.)

The March 22, 2010, treatment plan review notes that the Posttraumatic Stress Diagnostic Scale ("PDS") was administered to Plaintiff during the review period, and Plaintiff scored in the

moderate-to-severe range, with a decrease in symptom severity since she began treatment at SHCC. (See id. at 518.) The review further notes that Plaintiff was "compliant with medication and appointments with psychiatrist." (Id.) The treatment plan review also indicates that Plaintiff was "doing well with the new [Seeking Safety] treatment model." (Id.)

c.    *Dr. Sonya Owley, M.D.*

Dr. Sonya Owley, M.D., a third SHCC psychiatrist, co-signed two SHCC treatment plan reviews dated June 21, 2010, and September 20, 2010, both of which are also co-signed by Ms. Robinson and Dr. Forero. (See id. at 509, 514.) Both reviews note that the PDS was administered to Plaintiff during the review period. (Id. at 508, 513.) The June 21, 2010, review reports that Plaintiff "scored in the moderate to severe range" of the PDS and that the "number of symptoms endorsed ha[d] increased however the severity of the symptoms ha[d] decreased since last quarter." (Id. at 513.) The September 20, 2010, review reports that Plaintiff "scored in the severe range" of the PDS, and that over that quarter the "number of symptoms endorsed ha[d] increased as well as the severity of the symptoms." (Id. at 508.) The September 20, 2010, review also notes that Plaintiff "reported a domestic violence incident occurring [that] quarter." (Id.) Both reviews continue to assign Plaintiff an Axis I diagnosis of PTSD and major depressive disorder, recurrent; and a current GAF of 50. (Id. at 506, 511.)

It does not appear that Plaintiff was treated directly by Dr. Owley (or any other SHCC psychiatrist after Dr. Low); Dr. Owley's involvement appears to have been limited to co-signing these treatment plan reviews and consulting with SHCC personnel. (See id. at 271, 356, 519 (noting that upon Dr. Low's departure from SHCC, Plaintiff would be seen by her primary care physician with respect to any psychiatric medications).)

7

#### d.     Dr. Ana Rodriguez, Ph.D.

Dr. Ana Rodriguez, Ph.D., an SHCC attending psychologist, co-signed an SSA medical

report questionnaire dated April 1, 2010, along with Plaintiff's therapist, Sherri Robinson,

L.C.S.W.-R.[6]  (See id. at 253-59.)  Although the extent of Dr. Rodriguez's treatment of Plaintiff

is unclear from the record, the ALJ characterized Dr. Rodriguez as one of Plaintiff's treating

physicians.  (See id. at 17.)  The questionnaire diagnoses Plaintiff with PTSD (severe),

Bipolar II, and major depression, recurrent.  (Id. at 253.)

In the questionnaire, Dr. Rodriguez and Ms. Robinson opine that Plaintiff meets the

criteria for PTSD (Listing 12.06) in all three areas, i.e., re-experiencing, persistent avoidance,

and increased arousal.  (Id.)  They opine that Plaintiff has "impaired sensorium and intellectual

functions," including with respect to attention and concentration, memory, and information; and

they opine that Plaintiff's insight and judgment are "fair."  (Id. at 256.)  They further opine that

Plaintiff's ability to perform work-related mental activities is "limited"—specifically, that

Plaintiff has limited functionality with respect to understanding and memory, sustained

concentration and persistence, and social interaction.  (Id. at 258.)  However, no explanation of

these opinions is provided, despite the questionnaire's request for such explanation and/or

examples.  (See id. at 256, 258.)  They also note that Plaintiff is "neat in appearance" and

"cooperative in attitude."  (Id. at 256.)  No other reports or treatment notes of Dr. Rodriguez

appear in the record.

---

[6] The Commissioner contends that Dr. Rodriguez's name on the final page of the medical questionnaire (see R. at 259) is not a signature, and that therefore the opinions expressed in the questionnaire should be attributed only to Ms. Robinson, whose signature actually appears on the final page. (Def. Mem. at 14 n.7, 29 n.9; Def.'s Mem. of Law in Further Supp. of Def.'s Mot. & in Opp'n to Pl.'s Cross-Mot. ("Def. Reply") (Dkt. 19) at 2.) Plaintiff argues that the name is Dr. Rodriguez's signature, and that in any event, the ALJ treated it as such. (Pl. Mem. at 6 n.2.) The court is not in a position to determine whether Dr. Rodriguez in fact signed the questionnaire, and will treat the questionnaire as did the ALJ in this regard—viewing Dr. Rodriguez as having signed the questionnaire and, accordingly, having concurred with its content. (See R. at 17.)

*e.    Dr. Michelle Bornstein, Psy.D.*

Dr. Michelle Bornstein, Psy.D., a licensed psychologist, conducted a consultative examination of Plaintiff on March 18, 2010. (Id. at 217-20.) Dr. Bornstein diagnosed Plaintiff as having Axis I major depressive disorder, moderate to severe, with psychotic features (auditory hallucinations). (Id. at 219.)

With respect to Plaintiff's "current functioning," Dr. Bornstein noted that Plaintiff reported: (1) "difficulty falling asleep and awaken[ed] four times per night"; (2) a "normal appetite"; (3) "depressive symptoms including dysphoric moods, crying spells, loss of usual interests, and social withdrawal since 2008"; (4) "some anxiety and nightmares about the abuse situation"; and (5) "auditory hallucinations of voices telling her 'to kill [her]self,' though states the medications are helping to control this symptom at this time." (Id. at 217.) Dr. Bornstein noted "no evidence or report of panic attacks and manic symptoms" and "no evidence or report of cognitive defect." (Id. at 217-18.)

In connection with a "mental status examination," Dr. Bornstein found that Plaintiff was generally "cooperative" and "adequately groomed," and presented an "adequate" "manner of relating, social skills, and overall presentation." (Id. at 218.) She found that Plaintiff "spoke fluently in a clear voice" with "adequate" "expressive and receptive languages." (Id.) Plaintiff's thought process was "[c]oherent and goal directed." (Id.) Dr. Bornstein found Plaintiff to have depressed affect and dysthymic mood. (Id.) Plaintiff's sensory faculties were "clear," and her orientation "x3." (Id.) Plaintiff's attention and concentration were "[i]ntact[,] as evidenced by serial 3s, simple calculations, and counting." (Id.) Plaintiff's recent and remote memory skills were "[i]ntact," as she "was able to perform 3 out of 3 objects immediately and 2 out of 3 objects after five minutes," including "5 digits forward and 3 digits backward." (Id. at 218-19.) Dr.

Bornstein estimated Plaintiff's cognitive functioning to "fall in the average range," and noted that she appeared to possess a "limited" "general information fund." (Id. at 219.) She determined Plaintiff's insight and judgment to be "fair." (Id.)

Dr. Bornstein noted that Plaintiff has the capacity to "dress, bathe, and groom, cook, clean, do laundry, shop, manage her money, and take public transportation." (Id.) She noted that Plaintiff reported having one friend who sometimes assisted Plaintiff around her home, and being "close with her mother and sister." (Id.) Plaintiff also reported spending her time "taking care of her children, running errands, and working five hours per week." (Id.)

Dr. Bornstein opined that Plaintiff "can follow and understand simple directions and instructions," "perform simple tasks independently," "maintain attention and concentration, maintain a regular schedule, and learn new tasks." (Id.) Dr. Bornstein further opined, however, that Plaintiff "may need supervision performing complex tasks." (Id.) She also opined that Plaintiff "can make appropriate decisions, relate adequately with others, and appropriately deal with limited amounts of stress at this time." (Id.)

Dr. Bornstein noted that Plaintiff was taking the following medications: Abilify, Trazodone, Seroquel, Benztropine, Vitamin D, and a multivitamin. (Id. at 217.)

f.    Dr. G. Minola, M.D.

Dr. G. Minola, M.D., a state agency non-examining psychiatric consultant, reviewed Plaintiff's medical and treatment records and issued an opinion dated April 19, 2010. (See id. at 17, 221-34, 241-46.) In a form document entitled "Mental Residual Functional Capacity Assessment," Dr. Minola opined that Plaintiff appeared "to be able to understand[,] remember & carry out simple tasks in a low stress environment[,] & to relate to peers & supervisors in a work setting." (Id. at 243.) Dr. Minola also noted Plaintiff was "lonely[,] isolated and tearful" and

10

had "difficulty sleeping[,] toss[es] and turns." (Id. at 242.) Dr. Minola further opined that Plaintiff's abilities were "moderately limited" with respect to understanding and memory and sustained concentration and persistence for all but "very short and simple" tasks. (See id. at 241-42.) Dr. Minola indicated that Plaintiff's abilities were "not significantly limited" with respect to social interaction or adaptation. (See id.)

Dr. Minola also completed a "Psychiatric Review Technique" form (id. at 221-340), in which he opined that Plaintiff was properly diagnosed with a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome," and/or a medically determinable "mood disorder." (Id. at 224.) With respect to functional limitations, he opined that Plaintiff suffered "mild" "restriction of activities of daily living" and "mild" "difficulties in maintaining social functioning" as a result of her mental disorder(s), as well as "moderate" "difficulties in maintaining concentration, persistence or pace." (Id. at 230.) He opined that Plaintiff did not suffer any limitations related to "repeated episodes of deterioration, each of extended duration." (Id.)

3. Therapeutic Evidence

a. *Jessica Paddock, S.W.I., and C. Danette Wilson Gonzalez,*
*L.C.S.W.-R.*

Jessica Paddock, an SHCC Social Work Intern, was Plaintiff's treating therapist from November 14, 2008, through April 22, 2009. (See id. at 352, 381.) Ms. Paddock's treatment of Plaintiff appears to have been supervised in full by C. Danette Wilson Gonzalez, L.C.S.W.-R., and Ms. Gonzalez co-signed all of Ms. Paddock's treatment notes and outreach progress notes regarding Plaintiff. (See id. at 315-52.)

On November 14, 2008, Ms. Paddock and Plaintiff had their first individual therapy session, during which Plaintiff "discussed her experiences of verbal, physical and economic

11

abuse by her husband." (Id. at 352.) On November 24, 2008, Ms. Paddock administered Plaintiff a Modified Simple Screening Instrument for Substance Abuse ("MSSI-SA") and a Posttraumatic Stress Impact of Event Scale ("IES"). (Id. at 349, 475-79.) Plaintiff obtained a score of 1 on the MSSI-SA, indicating a nonexistent-to-low degree of risk for substance abuse, and a score of 50 on the IES, in the severe range. (Id. at 475-79.) During the therapy session on this date, Plaintiff "discussed in detail her trauma reactions and the impact they [were] having on her functioning." (Id. at 349.)

On December 3, 2008, Ms. Paddock completed an "Adult Psychological Assessment" of Plaintiff. (Id. at 262-69.) In the assessment, Ms. Paddock noted that Plaintiff reported antidepressants prescribed by her primary care physician to have been helpful, but also that "since the domestic violence has worsened she has additional distress that her medication is ineffective in alleviating." (Id. at 262.) Ms. Paddock documented Plaintiff's desired goal of "getting back to her 'old self,'" which was "happy and believing she [could] do anything without limits." (Id.) Ms. Paddock noted no current or past substance abuse or addiction history, although Plaintiff stated having "been a social drinker in the past." (Id. at 264.) Ms. Paddock noted that Plaintiff had "many brothers, sisters and cousins who she is close with," as well as "many friends[; h]owever, since experiencing severe domestic violence," Plaintiff either had become or wished to become "more socially isolated." (See id. at 267.)

Ms. Paddock's psychological assessment indicates that Plaintiff had suffered emotional abuse and neglect by her father since the age of seven, and continuing through adulthood; specifically, Plaintiff's father "consistently put her down because of her weight," and "has not acknowledged her when he sees her in public." (Id. at 265.) The assessment also indicates that

12

Plaintiff had been abused by her husband for six years, with the most recent incident of domestic violence occurring on October 2, 2008. (Id. at 266.)

Ms. Paddock indicated in the December 2008 psychological assessment that Plaintiff exhibited numerous symptoms of trauma. (See id. at 267-68.) Under the category of "re-experiencing," Plaintiff exhibited the following symptoms: recurrent and intrusive images, thoughts, or perceptions; acting or feeling as if the traumatic event were recurring; intense psychological distress at exposure to internal or external trauma cues; and physiological reactivity on exposure to internal or external trauma. (Id.) Under the category of "persistent avoidance," Plaintiff exhibited the following symptoms: efforts to avoid thoughts, feelings, or conversations associated with the trauma; markedly diminished interest or participation in significant activities; feelings of detachment or estrangement from others; and restricted range of affect. (Id. at 268.) Under the category of "increased arousal," Plaintiff exhibited the following symptoms: difficulty falling or staying asleep; irritability or outburst of anger; difficulty concentrating; and exaggerated startle response. (Id.)

Ms. Paddock concluded that Plaintiff "manifest[ed] a number of PTSD symptoms which [were] impacting her ability to function," and that Plaintiff would "benefit from weekly individual treatment to teach her affect management skills and how to process the impact of her trauma." (Id. at 269.) Ms. Paddock recommended a psychiatric evaluation to assess the effectiveness of Plaintiff's use of the medications Cymbalta and Lexapro. (See id. at 263, 269.) Ms. Paddock also noted Plaintiff's desire for a psychiatric evaluation "because she fear[ed] there are other things 'wrong' with her in addition to her diagnosis of depression."[7] (Id. at 263.) Ms. Paddock assigned Plaintiff a provisional Axis I diagnosis of PTSD and major depressive disorder, recurrent; and a GAF of 50 (both current and over the past year). (Id. at 268.)

---

[7] Plaintiff's primary care physician reportedly had diagnosed Plaintiff with depression previously. (Id. at 267.)

In treatment notes dated December 8, 2008, Ms. Paddock noted that Plaintiff reported suicidal ideation, but no plans, which Plaintiff "attributed to her depression medication 'not working.'" (Id. at 345.) In a note dated December 9, 2008, Ms. Gonzalez reported on a phone call during which Plaintiff reported "feel[ing] overwhelmed by financial issues and the thought of going to Family Court on Thursday for a Child Support hearing," but that she was not currently feeling suicidal. (Id. at 343.) In a note dated December 10, 2008, Ms. Paddock reported speaking with Plaintiff, who advised she had "felt overwhelmed" the day before, but was currently "feeling stable." (Id. at 342.) In a note dated December 11, 2008, Ms. Gonzalez again reported speaking with Plaintiff, who again advised that she was "feeling stable with no suicidal thoughts or plans." (Id. at 341.)

In treatment notes dated December 12, 2008, Ms. Paddock noted that Plaintiff reported that "the suicidal ideation she has recently been experiencing is not present at the moment, but that it comes 'out of nowhere.'" (Id. at 340.) Plaintiff also "identified social isolation as triggering [her] suicidal ideation." (Id.)

In treatment notes dated December 19, 2008, Ms. Paddock noted that Plaintiff "reported she was feeling 'better' and [was] not experiencing suicidal ideation at this time." (Id. at 339.) During this therapy session, Plaintiff was able to decrease her feelings of anxiety through a controlled deep breathing relaxation exercise. (See id.)

In treatment notes dated January 16, 2009, Ms. Paddock noted that Plaintiff "discussed her recent phone conversations with her batterer [husband] and the effect his words were having on her." (Id. at 336.)

14

In treatment notes dated January 23, 2009, Ms. Paddock noted Plaintiff reported "suicidal ideation earlier in the week but . . . resolved her feelings of distress" through the use of a developed therapeutic safety plan. (Id. at 334.)

In treatment notes dated February 17, 2009, Ms. Paddock noted Plaintiff "shared that she has been feeling much better, is no longer drinking [alcohol] and is being much more active and social." (Id. at 329.) Plaintiff also reported participating in a support group for domestic violence survivors, and that she had been "making use of affect regulation techniques taught in previous sessions." (Id.) In March 4, 2009, treatment notes, Ms. Paddock noted that Plaintiff again discussed her participation in the support group. (Id. at 326.)

In treatment notes dated March 11, 2009, Ms. Paddock noted Plaintiff "discussed her most recent telephone interactions with her husband and the impact they have had on her," as well as "her current trauma symptoms." (Id. at 325.) Plaintiff also reported a new romantic relationship with a friend, who in the past had been physically abusive to Plaintiff. (Id.) During this session, Ms. Paddock addressed Plaintiff's "cognitive distortions." (Id.)

In treatment notes from an April 1, 2009, session, Ms. Paddock noted Plaintiff indicated that she had begun drinking again, on weekends, when her children were at Plaintiff's mother's home. (Id. at 321.) Ms. Paddock "connected [Plaintiff's] alcohol abuse to the increasingly painful topics she has been discussing in therapy as well as the impending termination of the therapeutic relationship." (Id.)

In treatment notes dated April 8, 2009, Ms. Paddock noted that Plaintiff reported not drinking recently due to a new tongue piercing. (Id. at 319.) Plaintiff shared "trauma-related cognative distortions" in that therapy session. (Id.)

15

In treatment notes dated April 15, 2009, Ms. Paddock noted Plaintiff stated that "she fear[ed] her depression and suicidal ideation will increase after terminating" therapy with Ms. Paddock, as Ms. Paddock's internship with SHCC was ending. (See id. at 318.) Ms. Paddock held her last therapy session with Plaintiff on April 22, 2009; Plaintiff was then transferred to Ms. Robinson for further therapy sessions. (See id. at 315, 317.)

Ms. Paddock also co-signed three of Plaintiff's SHCC treatment plan reviews, dated December 19, 2008; December 29, 2008; and March 27, 2009, along with Ms. Gonzalez and Dr. Jacobs. (See id. at 532-41.) The content of these treatment plan reviews is discussed above, see supra Part I.A.2.a. Additionally, Ms. Paddock completed an SHCC closing report dated April 22, 2009, and co-signed by Ms. Gonzalez and Dr. Jacobs, summarizing Ms. Paddock's treatment of Plaintiff as Ms. Paddock prepared to leave SHCC. (See id. at 381-82.) The summary closing report is also discussed above, see supra Part I.A.2.a.

Finally, Ms. Paddock documented that Plaintiff missed at least six therapy sessions during her period of treatment. (See id. at 324, 327, 332, 333, 337, 350.) Two of these missed sessions apparently were due to Plaintiff's children's dentist appointments and school photos (id. at 327, 350); one was due to Plaintiff's inability to afford an anticipated co-pay (id. at 337).

*b.    Sherri Robinson, L.C.S.W.-R.*

Sherri Robinson, L.C.S.W.-R., provided therapy to Plaintiff through SHCC from at least April 27, 2009, through at least October 13, 2010. (See id. at 271-72, 315; see also id. at 61, 271, 348 (suggesting Robinson was involved in Plaintiff's treatment in 2008).)

In treatment notes dated May 4, 2009, Ms. Robinson noted that Plaintiff reported feeling suicidal during the past week. (See id. at 313.)

In treatment notes dated June 1, 2009, Ms. Robinson noted Plaintiff disclosed that the friend with whom she had recently become romantically involved continued to abuse Plaintiff.

16

(Id. at 308.) Ms. Robinson provided Plaintiff with psychoeducation regarding the "battering, dominating and intimidating behaviors" of Plaintiff's abuser. (Id.)

In treatment notes dated June 12, 2009, Ms. Robinson noted that Plaintiff reported "doing better . . . in part due to her being back on her medication." (Id. at 306.) During this session, they discussed Plaintiff medicating her trauma symptoms with alcohol. (See id.)

In treatment notes dated June 16, 2009, Ms. Robinson noted that Plaintiff reported sleep issues including an inability to sleep for more than two hours at a time. (Id. at 305.) During this therapy session, Ms. Robinson explored Plaintiff's trauma symptoms, which included intrusive thoughts of her abuse. (Id. at 305.)

In treatment notes dated June 29, 2009, Ms Robinson noted that Plaintiff reported being compliant with medications and feeling less depressed. (Id. at 303.)

In treatment notes dated July 6, 2009, Ms. Robinson noted that Plaintiff discussed the resumed relationship with the "old friend who had battered her this past year." (Id. at 302.) Plaintiff explained that after her relationship with her husband ended, she reunited with the old friend, and that "the relationship has been off and on and there have been several battering incidences." (Id.) Plaintiff discussed being fearful of this friend and drinking alcohol in order to pacify him, as well as in order to self-medicate and feel less anxious. (Id.) During this session, Ms. Robinson provided Plaintiff with psychoeducation relating to her friend's abusive behavior, and explored the potential risks of combining alcohol with psychotropic medications. (See id.)

Ms. Robinson administered Plaintiff an MSSI-SA test on July 20, 2009; Plaintiff received a score of 7, indicating a moderate-to-high degree of risk for substance abuse. (Id. at 473-74; see also id. at 264, 300.) In treatment notes from that day, Ms. Robinson noted Plaintiff's increase in trauma symptoms, and the increase in her use of alcohol since October 2008. (See id. at 300.)

17

In treatment notes dated August 10, 2009, Ms. Robinson stated that Plaintiff reported feeling "very depressed, . . . crying frequently, [and an] inability to take care of things in [the] home such as cleaning." (Id. at 299.) Ms. Robinson introduced a new treatment model, entitled "Seeking Safety," in an effort to reduce Plaintiff's "use[] [of] alcohol to manage trauma symptoms." (Id.)

In treatment notes dated October 2, 2009, Ms. Robinson noted that Plaintiff reported "very intense emotions" and that Plaintiff had called both her psychiatrist and a friend for help earlier in the week because she was feeling depressed. (Id. at 289.) Plaintiff had no current suicidal ideation or plan. (Id.)

On October 5, 2009, Ms. Robinson wrote a reference letter for Plaintiff, advising that Plaintiff was "looking to obtain employable skills" and gain employment. (Id. at 446.)

In treatment notes dated October 14, 2009, Ms. Robinson noted that Plaintiff "identified that she has 'a lot of anger issues.'" (Id. at 287.) Plaintiff was "sleeping a little better and [was] compliant with medication and appointments with the psychiatrist." (Id.)

In treatment notes dated October 19, 2009, Ms. Robinson noted that Plaintiff reported "going to orientation classes for EMT and computer skills." (Id. at 286.)

In treatment notes dated November 2, 2009, Ms. Robinson noted that Plaintiff reported having a "rough week" and drinking alcohol on Friday and Saturday, and having failed to take her medication those days. (Id. at 283.)

In treatment notes dated November 12, 2009, Ms. Robinson noted that Plaintiff had failed to take her medications the previous week, possibly because she could not afford the co-payment; Plaintiff advised that she had to borrow money from her husband in order to do so, but was now back to taking her medications. (See id. at 282.) In treatment notes dated

November 16, 2009, Ms. Robinson noted that Plaintiff was compliant with medication. (Id. at 280.)

In treatment notes dated December 7, 2009, Ms. Robinson noted that Plaintiff "engaged in good coping and denies any substance use since [the] last session." (Id. at 276.)

On December 10, 2009, Plaintiff called Ms. Robinson to advise her that Administration for Children's Services ("ACS") was at her home, investigating child abuse allegations (specifically, whether Plaintiff had "allowed her children to be subjected to witnessing [Plaintiff] being physically abused"). (Id. at 275.) Ms. Robinson spoke to the ACS investigator at Plaintiff's request and explained that during her treatment of Plaintiff, there had been no concerns regarding Plaintiff being abused in front of her children. (Id.)

In treatment notes dated January 4, 2010, Ms. Robinson noted that Plaintiff "has developed a repertoire of grounding/affect regulation techniques which help her manage her trauma symptoms without alcohol." (Id. at 380.) In treatment notes dated January 25, 2010, Ms. Robinson noted that Plaintiff "discusse[d] blowing up at a friend over the weekend." (Id. at 378.) In February 23, 2010, treatment notes, Ms. Robinson noted that Plaintiff "was able to call back a friend she yelled at" (presumably this same friend) and that "it felt good to resolve this conflict." (Id. at 375.)

On March 1, 2010, Ms. Robinson administered Plaintiff the PDS; Plaintiff scored in the moderate-to-severe range, indicating a decrease in symptom severity from her initial IES administered in November 2008 (at which time she scored in the severe range), see supra Part I.A.3.a. (Id. at 374, 518.) In treatment notes from the same date, Ms. Robinson noted that Plaintiff "reported that the measure triggered memories of her assault." (Id. at 374.) Plaintiff was compliant with medication. (Id.)

In treatment notes dated April 5, 2010, Ms. Robinson noted the Plaintiff "is recognizing that she is being triggered by her children's father when he picks them up for vists, which has been about three times a week." (Id. at 370.) In a note dated April 19, 2010, Ms. Robinson documented that Plaintiff cancelled her therapy session because she "want[ed] to be by herself" after a difficult weekend with her children, but Plaintiff assured Ms. Robinson she was not suicidal. (Id. at 369.)

In treatment notes dated May 3, 2010, Ms. Robinson noted that Plaintiff reported she had not been attending therapy consistently because "she hasn't been doing well." (Id. at 368.) Plaintiff had ceased taking her medication and was "using alcohol and pills to manage trauma symptoms, specifically insomnia," because Plaintiff believed the medication no longer helped her to sleep. (Id.) During this session, Plaintiff also reported a "decreased ability to manage her feelings since stopping her medication," and she agreed to resume taking the medication. (Id.)

On June 21, 2010, Ms. Robinson administered Plaintiff the PDS; Plaintiff again scored in the moderate-to-severe range. (Id. at 362, 513.) "The number of symptoms endorsed ha[d] increased however the severity of the symptoms ha[d] decreased since the last quarter." (Id. at 513.)

In treatment notes dated August 23, 2010, Ms. Robinson noted that Plaintiff reported abuse by her new boyfriend two weeks prior. (Id. at 355.) Plaintiff also reported "relapsing and drinking two weekends ago which was why she couldn't keep her appointment [the previous] week." (Id.) Plaintiff stated that she had "not drank in over a week but is very depressed." (Id.) Plaintiff further reported that her children had been staying with her mother, off and on, and that she had been receiving support from a friend. (Id.) Ms. Robinson also noted Plaintiff was experiencing "increase[d] intrusive thoughts about her past abusive relationships including the

father of her children," and was currently out of medication but was not having any suicidal ideation. (Id.)

On August 30, 2010, Ms. Robinson again administered the PDS, and Plaintiff scored in the "severe range for level of impairment in functioning." (Id. at 271, 354, 393, 469-72.) In treatment notes dated the same day, Ms. Robinson noted Plaintiff had "recently experienced a new trauma and is experiencing increased trauma symptoms." (Id. at 354.) In a letter dated October 13, 2010, Ms. Robinson discussed the August 30, 2010, PDS, and opined that Plaintiff "endorsed 14 out of 17 trauma symptoms," and scored "40 out of 50 on the symptom severity score." (Id. at 271.) Ms. Robinson also opined on October 13, 2010, that Plaintiff met the criteria for PTSD, and was "unable to work for the foreseeable future" due to the "severity of her trauma symptoms," which impaired Plaintiff's functioning. (Id. at 271-72.) She further opined that Plaintiff had "intermittent sleep pattern, intrusive thoughts and flashbacks about her abuse." (Id. at 272.)

Ms. Robinson also co-signed a medical report questionnaire dated April 1, 2010, along with Dr. Rodriguez. (See id. at 253-59.) The questionnaire is discussed above, see supra Part I.A.2.d. Additionally, as Plaintiff's treating therapist, Ms. Robinson co-signed six SHCC treatment plan reviews, dated June 29, 2009; September 21, 2009; December 21, 2009; March 22, 2010; June 21, 2010; and September 20, 2010; these reviews are each also co-signed by an SHCC psychiatrist (Dr. Low or Dr. Owley), and by SHCC supervisor Dr. Forero. (See id. at 509, 514, 519, 523, 527, 530.) These treatment plan reviews are discussed above, see supra Parts I.A.2.b, -2.c.

Finally, Ms. Robinson documented that Plaintiff missed or cancelled (and/or rescheduled) approximately eighteen therapy sessions during her period of treatment (April 2009 through

21

October 2010). (See id. at 273, 277, 285, 295, 297, 304, 307, 309-10, 353, 357, 363-64, 369, 371, 373, 376-77.) Several of these sessions were missed or cancelled because Plaintiff's children were ill, or had school functions or doctors' appointments (see id. at 307, 309-10, 364); several were due to housing issues, where Plaintiff was required to wait for someone from the housing authority to come to her apartment to replace a broken refrigerator, or to fix the hot water (see id. at 295, 373, 376); several were due to conflicting appointments, such as a pre-surgery evaluation, an appointment with the SSA, or a meeting to obtain food stamp recertification (see id. at 277, 377); and many sessions were missed by Plaintiff without apparent justification (see id. at 273, 285, 304, 353, 357, 363, 371). On one occasion, Plaintiff cancelled "due to 'wanting to be by herself.'" (Id. at 369.)

4.     Additional Medical Evidence[8]: Dr. Robert Dickerson, D.O.

Dr. Robert Dickerson is a medical consultant who conducted a physical examination of Plaintiff for the SSA on March 18, 2010. (Id. at 213.) Dr. Dickerson noted Plaintiff's chief complaints to be PTSD and anemia, both of which he diagnosed. (Id. at 213, 216.) Dr. Dickerson noted Plaintiff was "obese, but appeared to be in no acute distress." (Id. at 214.) Dr. Dickerson also noted that Plaintiff required no assistance with movement, had a regular heart rhythm, normal chest and lungs, intact dexterity, and no noted motor or sensory deficit. (See id. at 214-15.)

Dr. Dickerson noted that Plaintiff admitted to occasional, ongoing liquor consumption that had begun in October 2008. (Id. at 214.) Dr. Dickerson also noted that Plaintiff cooked, cleaned, and dressed herself five times per week; did laundry twice per week; shopped once per

---

[8] The record also contains certain emergency room medical records from New York Methodist Hospital documenting treatment to Plaintiff for physical issues: an abnormal EKG in February 2008, and a slip and fall in July 2009. (Id. at 195-212.) As Plaintiff does not claim disability on the basis of physical impairments, these reports are not detailed in this Memorandum & Order.

week; provided childcare seven days per week; showered seven days per week; and spent time listening to the radio and reading. (Id.) Dr. Dickerson indicated no physical abnormalities and opined that Plaintiff "is unrestricted for any physical activity." (See id. at 214-16.)

**B.    Other Evidence**

1.    Plaintiff's Testimony

Plaintiff testified in a hearing before ALJ Lori Romeo on October 13, 2010. (See id. at 36-63.) Plaintiff testified to having two children, who were six and eight years of age at that time. (Id. at 44.) Plaintiff stated that on a typical day, she awoke at approximately 6:00 a.m. (Id.) She testified that when she awoke, she would help her children get ready for school if able to do so; however, approximately three times per week Plaintiff was unable to get her children off to school by herself, because she would get very depressed and not want to go outside, and on these instances, Plaintiff's niece and/or mother would take the children to school. (Id. at 44-45.) Plaintiff stated that it was "hard . . . to go outside," and when she did, she was "constantly . . . looking around, so [she] just feel[s] more secure at home." (Id. at 45.) Plaintiff testified that she had this experience approximately once per week. (Id. at 46.) Plaintiff also testified about occasionally taking the bus to get around, either by herself or with her best friend. (Id.)

Plaintiff testified regarding a boyfriend, whom she had met approximately one year prior, at a grocery store. (Id.) Plaintiff stated that most of her time with her boyfriend was spent indoors; approximately once every three months, they would go to dinner and/or a movie, and come home directly afterwards. (See id. at 47.)

Plaintiff testified that on her worst days, she would stay in bed all day. (Id. at 47.) On days that she felt better, she testified, she did some light cleaning, but still tried to stay inside. (See id. at 48.)

Plaintiff testified regarding her major stressors. She stated that she could not be around crowds, or in small, closed-in areas with crowds and noise. (Id. at 49.) She testified that it caused her stress to remember the 2008 domestic violence incident. (Id.) She further testified that dealing with her children also caused her stress, because she cared for her children, who needed to go outside, alone. (Id.) Plaintiff testified that she was unable to sleep at night because of "intrusive thoughts," namely, remembering the violence she experienced and worrying that her husband was going to come back to her home. (Id. at 51-52.) Plaintiff stated that she repetitively looked out her window and through the peephole to her front door, in order to make sure no one was outside, and closed her blinds. (Id. at 53.) Plaintiff stated that she typically got approximately two hours of sleep per night, and was unable to take naps during the daytime. (Id. at 51-52.)

Plaintiff believed her current medications needed to be increased; this was scheduled to occur on her next appointment. (Id. at 47-48.) Plaintiff advised she did not have any negative side effects from the medications, except for a heightened cholesterol level from the Seroquel. (Id. at 48.) Plaintiff also testified that she received IV infusions to treat her anemia, but had not received such an infusion in over a year. (Id. at 43.)

Plaintiff testified that she quit working her part-time job as a laboratory technician in May 2010 because she was having flashbacks, crying, and did not want to go outside. (Id. at 42.) Plaintiff's only sources of income were child support and food stamps. (Id. at 48-49.) Plaintiff also provided testimony regarding her previous job as a clerk, which she held from 1993 through 2003, and where she engaged in gathering research data. (See id. at 55-57.)

24

### 2. Vocational Expert's Testimony

Vocational expert Melissa Fass-Karlin[9] also testified at the October 13, 2010, hearing. (Id. at 54-61.) The ALJ posed a hypothetical to Ms. Fass-Karlin, describing an individual with Plaintiff's age, educational background, and vocational background, who could perform all levels of exertional work, but was limited to simple tasks. (Id. at 55-59.) Ms. Fass-Karlin opined that such an individual would be unable to perform Plaintiff's prior work as a clerk, but could perform the jobs of hand packager and cleaner, which exist in significant numbers in the local and national economies. (Id. at 59-60.) The ALJ then inquired if the same hypothetical individual could perform the jobs of hand packager and cleaner if she had the additional limitation that she could not work "with the public or in close proximity to co-workers." (Id. at 60.) Ms. Fass-Karlin opined that such an individual could perform these jobs. (Id.)

Plaintiff's counsel added an additional limitation to the hypothetical: He asked Ms. Fass-Karlin if the jobs of hand packer and cleaner would still be available if the same hypothetical individual was unable to leave her home approximately three days per week. (Id.) Ms. Fass-Karlin stated that if this individual could not leave her home and get to work three days per week, there would be no work available for her. (Id.)

### 3. Evidence Submitted After ALJ Decision

After the ALJ's initial determination, and prior to the SSA Appeals Council's review of that determination, Plaintiff submitted a Medication Progress Note dated August 5, 2011, from Park Slope Center for Mental Health. (See id. at 548; see also id. at 1-6.) The note is unsigned, and it is unattributed. (Id. at 548.)

---

[9] Ms. Fass-Karlin is erroneously referred to as Melissa Bass-Garland in the transcript of the ALJ hearing. (See R. at 36-63.)

The note states that Plaintiff was "seeking help" for PTSD and major depressive disorder, and that Plaintiff complained of insomnia, anxiety, intrusive recollections of abuse, and occasional auditory hallucinations. (Id.) It reports that Plaintiff was taking Abilify and Seroquel, but had "developed metabolic syndrome and want[ed] to be taken off atypicals," and that Plaintiff was not taking any antidepressant medication at that time. (Id.) The note states that Plaintiff had started therapy a month prior and reported feeling "somewhat better." (Id.) Plaintiff had no cognitive or memory problems. (Id.) Plaintiff was given an Axis I diagnosis of PTSD and major depressive disorder, and a GAF of 55. (Id.)

Plaintiff also submitted to the Appeals Council additional supplemental materials (medical and treatment records) dated February 2012 through July 2012. (See id. at 2.) As these records related to a time period post-dating the ALJ's August 2011 decision, the Appeals Council held them irrelevant with respect to the determination of whether Plaintiff was disabled on or before August 25, 2011. (Id.) Plaintiff does not challenge that determination, and these additional materials are not part of the record.

## II.  PROCEDURAL HISTORY

On or about November 24, 2009, Plaintiff filed applications for Social Security Disability and Supplemental Security Income benefits, alleging a disability onset date of October 2, 2008, due to PTSD caused by domestic violence, depression, anxiety, poor sleeping pattern, and bruised limbs. (See id. at 122-29, 165.) Both applications were denied on or about April 20, 2010. (Id. at 11, 64-71, 405-11.) Plaintiff requested a hearing before an ALJ. (Id. at 74-78.) On October 13, 2010, Plaintiff, represented by counsel, appeared before ALJ Lori Romeo. (See id. at 36-63.) Plaintiff and impartial vocational expert Melissa Fass-Karlin provided testimony at the hearing. (See id.) On August 25, 2011, ALJ Romeo issued a decision

26

finding Plaintiff was not disabled under the Social Security Act. (Id. at 8-19.) Plaintiff requested that the SSA Appeals Counsel review the ALJ's decision; and on January 10, 2013, the Appeals Council denied Plaintiff's request for review, upholding the ALJ's decision. (See id. at 1-7.)

On February 19, 2013, Plaintiff filed the instant action seeking judicial review of the SSA's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (See Compl. (Dkt. 1).) The Commissioner filed her Answer and a copy of the administrative record on May 24, 2013. (See Answer (Dkt. 7); see generally R.) The Commissioner and Plaintiff have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def. Mem.; Pl. Mem.)

## III. LEGAL STANDARDS

### A. Review of Final Determinations of SSA

Under Rule 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [she] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial

evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). Thus, as long as (1) the ALJ has applied the correct legal standard, and (2) the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

**B.     Determination of Disability**

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Social Security Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Social Security Act. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In Dixon v. Shalala, the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in . . . the social security regulations. These

28

are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

54 F.3d 1019, 1022 (2d Cir. 1995) (internal citations omitted).

The "burden is on the claimant to prove that [s]he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998). However, if the claimant shows at step four that her impairment renders her unable to perform her past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). If at any point in the five-step analysis the ALJ determines that the claimant is disabled or not disabled, the analysis is terminated, and there is no need for the ALJ to proceed further. See Barnhart v. Thomas, 540 U.S. 20, 24 (2003). In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642

(2d Cir. 1983)). Additionally, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id. (citing Sims v. Apfel, 530 U.S. 103, 110-11 (2000); 20 C.F.R. § 404.900(b)).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in concluding she was not disabled under the Social Security Act. Plaintiff does not dispute the ALJ's findings favorable to her, namely, that: (1) Plaintiff has not engaged in substantial gainful activity since October 2, 2008, the alleged onset date;[10] (2) Plaintiff has the severe impairments of PTSD, bipolar disorder, and major depressive disorder, and the non-severe physical impairment of anemia, which is controlled with the use of iron supplements;[11] and (3) Plaintiff does not have the residual functional capacity required to perform her past relevant work. Plaintiff's brief is not the model of clarity, but she appears to dispute at least the ALJ's (1) assessment of her residual functional capacity; and (2) step-five determination, based thereon, that jobs exist in significant numbers in the national economy that the Plaintiff can perform. It is unclear whether Plaintiff also challenges the ALJ's determination at step three that Plaintiff's impairment or combination of impairments do not meet or medically equal one of the SSA "listed" impairments, including Listings 12.04 and 12.06. (R. at 13-14; see Pl. Mem. at 4-7.)

Specifically, Plaintiff asserts that the ALJ incorrectly weighed the medical evidence, erred in her assessment of Plaintiff's credibility, and posed an incomplete hypothetical to the

---

[10]  The ALJ determined Plaintiff's part-time work as a laboratory technician did not rise to the level of substantial gainful employment. (R. at 13 n.1.)

[11]  Notwithstanding her anemia or her original application for benefits, listing "bruised limbs" as a cause of disability, Plaintiff does not seek a finding of disability on the basis of any alleged physical impairments or limitations.

vocational expert. (Pl. Mem. at 5-6.) As explained below, the court REMANDS for a reevaluation of the medical and therapeutic evidence and of Plaintiff's credibility. The court need not determine if Plaintiff specifically challenges the ALJ's decision at step three of the analysis (i.e., that Plaintiff does not meet Listing 12.04 or 12.06); to the extent—and only to the extent—that the ALJ's reevaluation of this evidence changes the ALJ's determination at step three, as well as her determination with respect to Plaintiff's residual functional capacity and at step five, she should reconsider that issue.

### A.      Weighing of Medical and Therapeutic Evidence

Plaintiff argues that the ALJ improperly weighed the medical evidence. Specifically, she asserts that the ALJ improperly assigned more weight to the opinions of the consulting sources, Drs. Bornstein and Minola, than to the opinions of the treating sources, Ms. Robinson and Dr. Rodriguez.

### 1.      Treating Physician Rule and Weight of Medical Opinions

Under the SSA's regulations, "a treating physician's report is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). A "treating physician" is a physician or psychologist "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008) (adopted report and recommendation); see also 20 C.F.R. § 404.1513(a)(2) (licensed or certified psychologists are "acceptable medical sources"). The SSA's "treating physician rule" requires an ALJ to give a treating physician's opinion "controlling weight" where that opinion on "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Conversely, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion, . . . that opinion will not be deemed controlling." Snell, 177 F.3d at 133. In addition, "some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner," and, therefore, the treating physician's conclusions as to these issues are never given controlling weight. Id. (internal quotation marks omitted).

Even where an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must assess several factors in order to determine how much weight to give the opinion. See 20 C.F.R. § 404.1527(c)(2). In order to determine what weight to give the opinion, the ALJ must assess "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2)-(6). While an ALJ need not mechanically recite these factors, he or she must "appl[y] the substance of the treating physician rule." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

Indeed, the ALJ must evaluate every medical opinion received, and must determine how much weight to give each such opinion; in doing so, the same factors apply, and the ALJ will

ordinarily assign more weight to the opinion of an examining source than to that of a non-examining source. See 20 C.F.R. § 404.1527(c)(1)-(6).

2.  Weight Given to Opinions of Dr. Rodriguez and Ms. Robinson

In the April 1, 2010, medical report questionnaire completed by Ms. Robinson (Plaintiff's treating therapist) and Dr. Rodriguez (Plaintiff's treating physician), it is opined that Plaintiff met the criteria of Listing 12.06 in connection with her PTSD diagnosis. (See R. at 17, 253.) Ms. Robinson also opined in an October 13, 2010, letter (one not co-signed by Dr. Rodriguez) that Plaintiff met Listing 12.06. (Id. at 271.) The April 2010 medical report questionnaire also attributes to Plaintiff additional diagnoses of major depressive disorder, recurrent; and Bipolar II. (Id. at 253.) From a review of the ALJ's decision, it is unclear whether the ALJ attributed the additional opinions expressed in the questionnaire (e.g., that Plaintiff had impairments with memory, information, and intellectual functioning; and that Plaintiff had limited social functioning), and/or Ms. Robinson's opinions expressed in her October 2010 letter, solely to Ms. Robinson or instead to both Ms. Robinson and Dr. Rodriguez. (See id. at 17.) It is also unclear whether the ALJ considered additional opinions expressed in Ms. Robinson's October 13, 2010, letter (id. at 271), or any other evidence of Plaintiff's functional limitations that may have been found in Ms. Robinson's various treatment notes (e.g., id. at 271-314, 353-80). (See id. at 17, 271.)

Specifically, the ALJ noted that Ms. Robinson had opined that Plaintiff had impairments with memory, information, and intellectual functioning, but that the record did not show that memory or IQ tests were performed, and that Ms. Robinson made no reference to memory or IQ problems in her October 2009 reference letter indicating that Plaintiff should be considered for job training opportunities. (Id. at 17.) The ALJ also explained that while Ms. Robinson opined

that Plaintiff had limited social functioning, this was inconsistent with the record, which indicated that Plaintiff had become involved with a new boyfriend, worked part time, and was close with her family. (See id.) Ultimately, the ALJ stated that "although this opinion was considered it was not given controlling weight, as it was inconsistent with the claimant's actual activities of daily living." (Id.)

As Plaintiff's treating physician, Dr. Rodriguez's opinions must be given controlling weight if supported by medically-acceptable techniques and unless found to be inconsistent with other substantial evidence in the record. But as it is unclear which opinions the ALJ in fact attributed to Dr. Rodriguez, the court is unable to determine whether the ALJ's decision not to give those opinions controlling weight was appropriate. Furthermore, it is unclear whether the ALJ's statement ("this opinion was not given controlling weight") pertained to solely Dr. Rodriguez's opinions, to both Dr. Rodriguez's and Mr. Robinson's opinions, or possibly to Ms. Robinson's opinions alone, as the ALJ's statement followed a direct list of opinions that it appears the ALJ may have attributed solely to Ms. Robinson. (See id.)

Additionally, if a treating physician's opinion is not entitled to controlling weight, the court must decide whether the ALJ provided "good reasons" for the amount of weight ultimately given to the opinion, Halloran, 362 F.3d at 33, based on the factors set forth in the regulations, see 20 C.F.R. § 404.1527(c)(2). Again, because the ALJ's decision was unclear with respect to what opinions she attributed to Dr. Rodriguez versus Ms. Robinson, it is impossible for the court to find that such "good reasons" were provided for the weight given thereto, or that the appropriate factors were considered. Accordingly, the court will remand the case for a proper evaluation of Dr. Rodriguez's medical opinions pursuant to the treating physician rule.[12]

---

[12] The Commissioner argues there is no evidence in the record, other than the questionnaire, that Dr. Rodriguez treated the Plaintiff. (Def. Reply at 2.) This fact should be considered and applied during the ALJ's analysis of the

34

As explained above, the ALJ's decision was unclear with respect to which opinions it attributed solely to Ms. Robinson. As Plaintiff's treating therapist and social worker, Ms. Robinson is not considered an "acceptable medical source[]" under the regulations. 20 C.F.R. § 404.1513(a). Accordingly, her sole opinions are not entitled to controlling weight; however, upon remand, the ALJ should consider Ms. Robinson's opinion as an "other [acceptable] source[]" of evidence of the "severity of Plaintiff's impairment(s) and how it affects [her] ability to work." Id. § 404.1513(d). The ALJ should consider the factors set forth in § 404.1527(c)(1)-(6), as appropriate, to determine what weight to give Ms. Robinson's opinions. SSR 06-03P, 2006 WL 2329939, at *4-6 (Aug. 9, 2006) (clarifying that the factors applicable to evaluation of medical opinions from "acceptable medical sources" can be applied, as appropriate based on the particular facts of each case, to opinions rendered by therapists and social workers). The ALJ should also consider additional information contained in Ms. Robinson's treatment notes insofar as that information may provide evidence of Plaintiff's impairments and ability to work. 20 C.F.R. § 404.1513(d).

3.    Weight Given to Opinions of Drs. Dickerson, Bornstein, and Minola

Plaintiff, who does not claim physical disability, does not contest the opinion presented by Dr. Dickerson or the weight the ALJ afforded this opinion, which pertained primarily to Plaintiff's physical condition and health.[13] Plaintiff does contest the weight given to the opinions of the other two consultative physicians: Dr. Bornstein, the examining consultative psychologist; and Dr. Minola, the non-examining, state agency consultative psychiatrist.

---

factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) in determining how much weight to give the opinion of Dr. Rodriguez.

[13] Dr. Dickerson opined there are no physical restrictions preventing Plaintiff from working (R. at 17), and there is no evidence in the record inconsistent with this finding that would detract from the weight ascribed to it by the ALJ.

The ALJ explained that Dr. Bornstein, who examined Plaintiff on March 18, 2010, opined that Plaintiff "can follow simple instructions, can perform tasks independently, may need supervision performing complex tasks, and can relate to others and deal with limited sources of stress." (R. at 17; see also id. at 219 (Dr. Bornstein's report).) The ALJ assigned "great weight" to this opinion "because [Dr. Bornstein] examined the [Plaintiff] and is well versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act . . . ." (Id. at 17.) Plaintiff argues two errors in the ALJ's application of great weight to Dr. Bornstein's opinion: (1) there is no evidence in the record to support the "attributes ascribed to her by the ALJ"; and (2) "the functional capacities set forth by Dr. Bornstein appear to be at odds with her diagnosis [of] 'major depressive disorder, moderate to severe, with psychotic features.'" (Pl. Mem. at 6 (citing R. at 219).)

This court agrees that there is no evidence in the record to support the ALJ's statement that Dr. Bornstein "is well versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act." (R. at 17.) This court does not agree, however, that the functional capacities set forth by Dr. Bornstein are at odds with her diagnosis. Disability is not determined solely by the presence of an impairment, but rather by the severe functional limitations caused by the impairment. Miller v. Astrue, No. 12-CV-3709 (GBD) (RLE), 2013 WL 5614114, at *9 (S.D.N.Y. Aug. 30, 2013) (report and recommendation), adopted, 2013 WL 5598057 (S.D.N.Y. Oct. 9, 2013). Dr. Bornstein was correct to examine the present functional limitations, if any, caused by the Plaintiff's impairments, and the effects those limitations had on her ability to work.

While the ALJ may give weight to the opinion of Dr. Bornstein because she is considered an acceptable medical source, this court does not agree that her opinion is entitled to "great

36

weight" under the ALJ's analysis. The ALJ affords "great weight" to Dr. Bornstein's opinion solely on the bases that she (1) "examined" the Plaintiff, and (2) is "well versed" in the assessment of functionality. (R. at 17.) As explained above, there is nothing in the record to support the second of these rationales. Moreover, this explanation does not provide "good reason" why Dr. Bornstein's opinion is entitled to "great" weight. The ALJ does not point to any other evidence in the record with which Dr. Bornstein's opinion is consistent, or by which it is supported; indeed, the ALJ's decision is completely silent with respect to evaluating Dr. Bornstein's opinion against the evidence that is in the record. Additionally, as a general matter, "limited" weight should be given to opinions rendered after consultative examinations because they "are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (quoting Torres v. Bowen, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)); see also Pogozelski, 2004 WL 1146059, at *13 (holding the ALJ erred in giving "more than limited weight" to the opinion of a physician who had examined the claimant on only one occasion). Accordingly, on remand, the ALJ should reevaluate the appropriate amount of weight to be given to Dr. Bornstein's opinion with consideration of these principles.

The ALJ also gave "great weight" to the opinion of Dr. G. Minola, the consulting psychiatrist, who reviewed the medical record but never met with the Plaintiff. (R. at 17.) Dr. Minola "opined that the [Plaintiff] can carry out and follow simple instructions in a low stress environment, and relate to peers and supervisors in a work setting." (Id.) "Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight

given to the opinions of a State agency medical or psychological consultant," just as the ALJ "must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the SSA]." 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ afforded Dr. Minola's opinion "great weight" because it "was consistent with the medical reports." (R. at 17.) She provided no reference to the medical reports to which she referred, or any other reason for giving the opinion such weight; and she does not discuss any other opinions expressed by Dr. Minola in his report. (See id.)

At least some of the content of Dr. Minola's reports is not wholly consistent with other medical reports in the record. In the "Psychiatric Review Technique" report, Dr. Minola indicated a check-box under the "12.04 Affective Disorders" listing, but indicated no listed symptoms (id. at 224), although within the depressive syndrome symptom list are included: sleep disturbances, which Dr. Minola himself opines exist elsewhere (id. at 242); thoughts of suicide and hallucinations, both of which are reported in Dr. Bornstein's report (id. at 218), and in additional medical reports (id. at 483); and difficulty concentrating or thinking, which Dr. Minola indicated separately (id. at 231), and which are listed as "impaired" in the medical questionnaire of Dr. Rodriguez and Ms. Robinson (id. at 256). These symptoms are not marked in Dr. Minola's report despite their consistency throughout the other medical records.

Dr. Minola also fails to indicate a diagnosis of "12.06 Anxiety Related Disorder" (id. at 226), despite there being numerous diagnoses of PTSD in Plaintiff's records (id. at 253, 484, 506-41), which were credited by the ALJ (see id. at 13). This area includes a check-box designated for "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." (Id. at 226.) This symptom is directly documented and diagnosed in

the medical questionnaire, signed by Dr. Rodriguez (id. at 253), and is continually listed in treatment plans signed by the listed psychiatrists at SHCC (id. at 506-41).

As the court is remanding this action due to the error in the evaluation of Dr. Rodriguez's and Dr. Bornstein's medical opinions (and for a reevaluation of Plaintiff's credibility, see infra Part IV.B), it need not determine whether giving "great weight" to Dr. Minola's opinions constituted error. On remand, the ALJ should consider Dr. Minola's opinions in light of her reevaluation of the other medical evidence and the factors set forth in the regulations.

### 4.    Weight Given to Opinions of Drs. Jacobs and Low

The record includes reports, treatment plans, and notes indicating that Plaintiff was evaluated and treated by Drs. Jacobs and Low, psychiatrists at SHCC, from December 2008 through March 2010. (E.g., R. at 312, 381-82, 481-84, 506-41.) The ALJ makes no reference to any of these acceptable medical sources/treating physicians in her analysis, and her decision does not indicate whether she considered or gave any weight to their respective opinions as required by 20 C.F.R. § 404.1527(c). Upon remand, the ALJ should determine whether Dr. Jacobs or Low expressed any opinions regarding Plaintiff's functional limitations, and if so, evaluate whether those opinions are entitled to controlling weight; she should also determine whether any other evidence contained in the records of Drs. Jacobs and Low bears upon Plaintiff's functional limitations, and if so, take that evidence into consideration.

### 5.    Weight Given to Opinions of Jessica Paddock and C. Danette Wilson Gonzalez

Ms. Paddock, Plaintiff's treating therapist from November 2008 through April 2009, is considered an "other [acceptable] source[]" pursuant to 20 C.F.R. § 404.1513(d), and Ms. Paddock's opinion must be considered and evaluated by the ALJ during her analysis. 20 C.F.R. § 404.1527(c); SSR 06-03P, 2006 WL 2329939, at *4-6. The record contains numerous

39

treatment notes, evaluations, and opinions expressed by Ms. Paddock during her treatment of the Plaintiff. (E.g., R. at 317-37, 339-40, 345-46, 381-82, 421-28, 475-79, 532-41.) Although the ALJ referenced Plaintiff's having a GAF score of 50, which was first determined by Ms. Paddock in December 2008 (id. at 16, 427), the ALJ failed to evaluate any of Ms. Paddock's opinions in her analysis or assign them any weight pursuant to the § 404.1527(c) factors.

On remand, the ALJ should consider the factors set forth in 20 C.F.R. § 404.1527(c)(1)-(6), as appropriate, to determine what weight to give Ms. Paddock's opinions. SSR 06-03P, 2006 WL 2329939, at *4-6. The ALJ should also consider additional information contained in Ms. Paddock's and Ms. Gonzalez's treatment notes insofar as that information may provide evidence of Plaintiff's impairments and ability to work. 20 C.F.R. § 404.1513(d).

**B.     Assessment of Plaintiff's Credibility**

The ALJ rejected Plaintiff's claim of disability in part because she found Plaintiff's testimony of her symptoms to be incredible. (R. at 15.) Specifically, the ALJ noted that the "claimant testified that she does not like to leave the house, cannot sleep, has intrusive thoughts of prior abuse, and her niece takes her children to school because she cannot leave the bed." (Id.) The ALJ found that this testimony "was inconsistent with her description of her daily activities to others and her actual activities," because "[o]n March 18, 2010, she reported cooking, cleaning, showering, and dressing five times per week, providing childcare seven days per week, working part-time and having friends." (Id.) Plaintiff argues that the ALJ improperly discredited Plaintiff's testimony because the daily activities pointed to by the ALJ were not in fact inconsistent with Plaintiff's claims. (Pl. Mem. at 7.)

An ALJ "is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of

the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam).
The regulations provide a two-step process for determining a claimant's credibility. See 20
C.F.R. § 404.1529(b). First, the ALJ must consider whether medical signs and laboratory
findings show the existence of a medical impairment which "could reasonably be expected to
produce the pain or other symptoms alleged." Id. If the statements about pain or other
symptoms are not supported by medical signs or laboratory findings, they cannot alone establish
that a claimant is disabled. See id.

If the medical evidence does support the existence of such a condition, the ALJ must
proceed to the second step and evaluate the "intensity and persistence" of the claimant's
symptoms to determine the extent to which they limit the claimant's capacity to work. Id.; see
also. e.g., Brown v. Colvin, 47 F. Supp. 3d 180, 186-87 (W.D.N.Y. 2014). At this second step,
the ALJ must consider both objective medical evidence as well as other evidence that may
suggest a "greater severity of impairment than can be shown by objective evidence alone." 20
C.F.R. § 404.1529(c)(3). In other words, the ALJ must consider a claimant's statements
regarding the "intensity, persistence, and limiting effects" of symptoms "in relation to the
objective medical evidence and other evidence." Id. § 404.1529(c)(4).

The ALJ found the testimony the Plaintiff provided at the October 13, 2010, hearing to be
inconsistent with a prior report of the Plaintiff's daily activities. (R. at 15.) The ALJ described
Plaintiff's testimony as averring that "she did not like to leave the house, cannot sleep, has
intrusive thoughts of prior abuse, and her niece takes her children to school because she cannot
leave the bed," and determined this testimony was not consistent with Plaintiff's report of daily
activities she provided on March 18, 2010: "On March 18, 2010, [Plaintiff] reported cooking,
cleaning, showering, and dressing five days a week, providing childcare seven days a week,

41

working part-time and having friends." (Id.) This court identifies two issues with respect to the ALJ's determination that such statements are inconsistent.

First, the ALJ somewhat mischaracterized Plaintiff's testimony. The ALJ stated that Plaintiff testified that "her niece takes her children to school because she cannot leave the bed." In fact, Plaintiff testified that her niece or mother will take her children to school on days that she is depressed and does not want to go outside. (Id. at 44.) She testified that this occurs approximately three days a week. (Id.) Separately, when the ALJ asked the Plaintiff what she did on days she "feel[s] the worst," Plaintiff responded that she remains in bed all day. (Id. at 47.) The ALJ's conflation of these two statements has created the inconsistency upon which the ALJ partly bases her determination. Therefore, a determination of the Plaintiff's credibility based on this comparison is not accurately supported by the record and should be reevaluated based upon Plaintiff's actual testimony.

Second, the court disagrees with the ALJ's conclusion that the statements made in the March 18, 2010, report are in fact inconsistent with Plaintiff's hearing testimony. Cooking, cleaning, showering, dressing, and providing childcare are activities that can—and are likely to—occur inside the home; they are not inconsistent with Plaintiff's statement that she does not like to leave the house. Additionally, the court does not perceive an inconsistency between Plaintiff's hearing testimony and her prior report of "having friends" or working five hours per week; and the ALJ did not explain how such claims are inconsistent. Finally, the March 2010 reported activities have no bearing on Plaintiff's claims that she is unable to sleep and has intrusive thoughts about prior abuse; once again, the ALJ failed to explain why these two

symptomatic claims are inconsistent with the March 18, 2010, report. The ALJ discredited Plaintiff's testimony in full instead of evaluating each claim against the evidence in the record.[14]

The court recognizes that ordinarily, the ALJ's determination of the claimant's credibility is entitled to great deference. Guzman, 2011 WL 666194, at *7; Pogozelski, 2004 WL 1146059, at *19. Here, however, the explanation given for the ALJ's determination is not based on Plaintiff's demeanor while testifying; instead, it relies on a misreading of Plaintiff's testimony and an untenable notion of inconsistency. See Genier, 606 F.3d at 50 ("Because the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence.'").

The ALJ also determined that the medical evidence in the record, while establishing that Plaintiff "has psychological problems[,] . . . does not support the degree of limitations alleged." (R. at 16.) This determination was tainted by the ALJ's failure to properly evaluate the opinions of Plaintiff's treating sources. This failure necessarily affected how the ALJ viewed the totality of the medical evidence, and consequently, whether Plaintiff's symptoms and their effects were substantiated by objective medical evidence. On remand, the ALJ is directed to consider Plaintiff's complaints in light of the ALJ's revised evaluation of the medical opinions. See Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) (declining to consider plaintiff's argument that the ALJ improperly assessed her subjective complaints because the ALJ's failure to properly weigh the medical evidence "affect[ed] consideration of the ALJ's treatment of the plaintiff's subjective complaints").

---

[14] The court notes that Plaintiff's claims appear to be consistent with opinions contained in Dr. Minola's "Mental Residual Functional Capacity Assessment" report (opinions that the ALJ gave "great weight"), in which he opined, in part, that Plaintiff is "lonely[,] isolated and tearful," and had "difficulty sleeping[,] toss[es] and turns." (R. at 242.) Neither this opinion nor other medical reports in the record documenting Plaintiff's insomnia are mentioned in the ALJ's analysis. (See id. at 51, 217, 482-83.)

## C.    Reliance on the Vocational Expert

Finally, Plaintiff argues the hypothetical the ALJ presented to vocational expert Melissa Fass-Karlin "did not fully incorporate the symptoms and limitations set forth by the treating sources." (Pl. Mem. at 7.) Plaintiff does not specify what symptoms or limitations she believes the ALJ should have included in the hypothetical.

The court declines to consider this argument at this time. The hypothetical the ALJ posed assumed a person of Plaintiff's age, education, and work experience, with no exertional limits, but who was limited to simple tasks, and who could not work "with the public or in close proximity to co-workers." (R. at 59-60.) The ALJ's determination of Plaintiff's residual functional capacity, and her incorporation of symptoms or limitations set forth by treating sources, necessarily depended upon her evaluation of those medical sources' opinions. On remand, the ALJ should reconsider the Plaintiff's residual functional capacity in light of her reassessment of the medical evidence and Plaintiff's credibility before consulting a vocational expert.

## V.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is DENIED, Plaintiff's cross-motion for judgment on the pleadings is GRANTED, and this case is REMANDED to the SSA for a proper evaluation of the medical and therapeutic evidence, including opinion evidence, and for a reevaluation of Plaintiff's subjective complaints, as accurately construed, in light of such evidence and the other evidence in the record.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
July **23**, 2015

NICHOLAS G. GARAUFIS
United States District Judge